959 F.2d 234
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Larry J. McCLATCHEY, Interim Trustee, Plaintiff-Appellant,
v.
PEABODY COAL COMPANY, Defendant-Appellee,
and
Joy Manufacturing Company, Defendant.
 No. 90-3591.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1992.
 
 Before RALPH B. GUY Jr. and RYAN, Circuit Judges, and JOINER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Robert Thomas,[1] an injured Ohio mine worker, brought a common-law intentional tort suit against his employer, Peabody Coal Company. At the close of Thomas's proofs, the magistrate judge presiding over this diversity case granted Peabody's motion for a directed verdict, holding that Thomas had failed to present sufficient evidence to make out a prima facie case of employer-intentional tort under the test set forth in Van Fossen v. Babcock & Wilcox Co., 36 Ohio St.3d 100 (1988). Finding no error, we affirm.
 
 I.
 
 2
 Thomas was injured in 1984 at defendant's Sunny Hill mine when the "continuous mining machine" he was operating by himself crushed him against the mine wall. The operation of this 44-ton machine is usually accomplished by two workers: an operator and a helper. The operator stands behind the machine and moves it backward and forward by remote control, positioning it to make cuts in the mine face. One of the helper's tasks is to move the machine's water and electrical cables out of the way.
 
 
 3
 Thomas operated the machine alone during the dinner hour one day in August 1984 when his helper, Alex Docie, left to eat dinner. Docie and Thomas thought that another miner, Larry Harper, would arrive soon to take Docie's place. Harper relieved the shuttle car driver instead. Harper did not testify that the foreman, Johnnie Higgins, told him to replace the shuttle car operator rather than Docie. Instead, Harper said it was a fellow employee, a car driver coming in for his dinner, who told Harper to serve as a shuttle car driver. Thomas claims that Higgins did so instruct Harper, arguing that Peabody "failed to assign [him] a helper, preferring instead to use the available employees to run a shuttle car to keep the coal moving." As Peabody frames its position, the company had assigned Thomas a helper that day, and was never made aware that Docie had left Thomas alone because neither Thomas nor Harper spoke to Higgins about who was to relieve Docie. No one disputes that the section crew, of which these men were members, was short-handed that day.
 
 
 4
 While acting alone, Thomas put the machine in reverse to prepare it for another cut, attempting to move the cables while holding the remote control box. He stumbled and lost control of the machine, which crushed him against the mine wall.
 
 
 5
 Seeking to avoid the exclusive remedy provisions of Ohio's workers' compensation law, Thomas brought a common-law intentional tort suit against Peabody. At the close of Thomas's proofs, the magistrate judge granted Peabody's motion for directed verdict, and Thomas now appeals.
 
 II.
 
 6
 We review the trial court's grant of a directed verdict under the same standard that court used in assessing the motion. Sawchick v. E.I. DuPont DeNemours & Co., 783 F.2d 635 (6th Cir.1986).
 
 
 7
 In considering a motion for a directed verdict under Rule 50(a), the trial court "must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury." As applied in this context, "sufficient evidence" is such that, when viewed in the light of those inferences most favorable to the nonmovant ... there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable men could differ.
 
 
 8
 Milstead v. International Bhd. of Teamsters, 580 F.2d 232, 235 (6th Cir.1978) (citations omitted). Under Ohio law, the elements of an injured employee's common-law intentional tort suit against his employer were set forth in Van Fossen v. Babcock & Wilcox Co., 36 Ohio St.3d 100 (1988), as clarified by Fyffe v. Jeno's, Inc., 59 Ohio St.3d 115 (1991).
 
 
 9
 Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed.1984), in order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process ... then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
 
 
 10
 Fyffe, 59 Ohio St.3d 115, syllabus 1.
 
 
 11
 We note that the Fyffe court, when amending paragraphs five and six of the Van Fossen syllabus by eliminating excess verbiage from that case's recitation of the three-part test, stated that its opinion "is not meant to materially change the law" as expressed in Van Fossen and other Ohio cases. Fyffe, 59 Ohio St.3d at 117. We do not believe that the Fyffe court effected any change in Ohio intentional-tort law from which Thomas might profit;[2] Thomas claims that the amendment assists him, but never tells us how.
 
 
 12
 The magistrate judge found that Thomas had presented sufficient evidence on only the first prong of the test. He stated that the jury could conclude that Peabody had been aware that its employees sometimes operated the continuous mining machine without a helper, and that such a practice was dangerous. Peabody insists on appeal, as at trial, that operating the machine single-handedly was not necessarily dangerous. Peabody presented uncontroverted evidence that a solitary operator could significantly reduce the danger by approaching the machine (to move its cables) only after setting down the remote control box. However, we agree with the magistrate judge that there was sufficient evidence--including testimony by a union official that operators had complained about working on the machine alone and that he had told the assistant mine superintendent such practice was like "playing with a cocked cannon"--from which the jury could conclude that solitary operation was a dangerous practice and that Peabody knew of the practice.[3]
 
 III.
 
 13
 The magistrate judge went on to find, however, that Thomas had failed to present sufficient evidence on the second and third prongs of the Van Fossen test, which require the injured worker to demonstrate that his employer knew that harm to the worker would be a "substantial certainty," and that it nevertheless "required" the worker to continue. We shall treat these two elements together in our analysis; Ohio cases seem rarely to have analyzed them separately, perhaps because the two are conceptually linked.
 
 
 14
 The Van Fossen opinion provided, in syllabus six, a more lengthy explanation of the term, "substantial certainty."
 
 
 15
 To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. Where the risk is great and the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk--something short of substantial certainty--is not intent.
 
 
 16
 Van Fossen, 36 Ohio St.3d at syllabus 6 (emphasis supplied).[4] The magistrate judge found that the evidence, at most, could demonstrate that Peabody had been negligent in permitting miners to operate the machine single-handedly on occasion. No reasonable juror, he said, could conclude that injury from this practice was substantially certain to occur, since the undisputed evidence showed that a miner could operate the machine without undue risk of injury. The magistrate judge also noted that no other miners had been injured in this way either before or after Thomas's accident, although, as he put it, "it is certainly not necessary that an injury occur each and every time that the dangerous practice in question is followed."
 
 
 17
 Thomas urges us to find a strong resemblance between this case and the facts of Fyffe, in which the Ohio Supreme Court reversed summary judgment for the defendant-employer. In Fyffe, the injured employee was a sanitation worker, assigned the task of cleaning conveyor belts at defendant's production plant. On the night Fyffe was injured, the sanitation crew was short-handed; evidence revealed that Fyffe was "pushed" to work faster than usual. When cleaning a conveyor belt while it was running, Fyffe reached into it to retrieve a foreign object. Defendant had removed a Plexiglas safety shield that would have prevented Fyffe from inserting his hand. Fyffe's glove snagged on the machinery, pulling his arm into the conveyor's moving parts. Additional evidence showed that it was a "common practice" for the sanitation employees to reach into the moving conveyors, that Fyffe's supervisor had trained him to clean the conveyor in this very way, and that Fyffe was never told not to reach into the conveyor while it was running. Fyffe, 36 Ohio St.3d at 119.
 
 
 18
 Viewing such evidence most favorably to Fyffe, the Ohio Supreme Court remanded the case for trial, necessarily finding that reasonable minds could differ as to whether the employer knew that injury in these circumstances was substantially certain to occur. Despite some similarity, however, between Fyffe and the present case, we do not believe that Fyffe mandates a reversal of the directed verdict here.
 
 
 19
 It is true that Fyffe is similar to the present case in several ways. Evidence indicated that it was "common practice" for Thomas and other miners to engage in the dangerous activity, just as it was in Fyffe; that supervisors were aware of this practice, as they were in Fyffe; that Thomas, like the workers in Fyffe, were pushed to work faster than usual; and that Thomas, like Fyffe, was a member of an understaffed crew. Thomas, however, would press the resemblance further and have us conclude that the failure to ensure that he had a helper during the dinner hour is equivalent in significance to the removal of the safety shield in Fyffe.
 
 
 20
 Two reasons prevent us from making this equation. It was undisputed that a miner could operate the machine single-handedly in relative safety by remaining behind the machine and putting down the remote control box before moving the cables out of the way. In contrast, there was no suggestion in Fyffe that the Plexiglas shield was not essential to workers' safety, having been designed to prevent the very accident that occurred. Second, the removal of the safety shield was concededly deliberate and permanent. Here, the defendant-employer did assign Thomas a helper on the day of the accident. Its failure to ensure that his helper was replaced during the dinner break can be described on this record as negligent or, at most, reckless.
 
 
 21
 These two cases are dissimilar in other important ways. Fyffe's supervisor instructed him that the way to clean the conveyor belts was to place his hands in them while they were running. Thomas does not suggest that any supervisor instructed him to operate the machine by himself or trained him to operate it in the way that he did. Indeed, Thomas maintains that the collective bargaining agreement between the miners union and Peabody required a two-man crew to operate the machine unless a loading device was attached.
 
 IV.
 
 22
 Although neither party has compared this case to any other Ohio Supreme Court decisions involving employer-intentional tort claims, a proper analysis of Thomas's suit requires us to examine the other two cases in the Van Fossen trilogy: Pariseau v. Wedge Prods., Inc., 36 Ohio St.3d 124 (1988), and Kunkler v. Goodyear Tire & Rubber Co., 36 Ohio St.3d 135 (1988). As these cases were decided on the same day as Van Fossen, they cannot be said to suffer from what Thomas describes as the post-Van Fossen confusion regarding the "substantial certainty" prong of the intentional tort test. These two cases illustrate just how egregious an employer's conduct must be in order for an injured employee to avoid the exclusive remedy provision of the state's workers' compensation statute.
 
 
 23
 In Pariseau, the plaintiff-employee's hand was smashed when he reached into a punch press to remove a finished article. Pariseau elicited evidence showing that the press had a history of repeating--of thrusting the ram component down for a second, unexpected strike--and that it had been repeating earlier that evening. There was also evidence showing that Pariseau's foreman may have adjusted the pullback restraint guards improperly, so that they failed to snatch Pariseau's hands out of the way when the press made a second strike. Additional evidence (disclosed in Justice Holmes' concurring opinion) indicated that another employee had been injured severely a few years earlier when the machine had repeated. Further, one of Pariseau's co-workers said she had refused to continue working on the press that very night when it began repeating. This employee also testified that, after she complained to the foreman about the press, he assigned Pariseau to operate it, tossing aside the wooden stick that employees sometimes used to retrieve finished parts and instructing Pariseau to use his hands to retrieve them.
 
 
 24
 Viewing this evidence most favorably to the injured employee, the Ohio Supreme Court nevertheless upheld the JNOV granted to the defendant-employer. It found that a jury presented with such evidence could not reasonably conclude that "the employer or his agent manifested an intent to injure the employee [which] intent includes the knowledge and expectation that such an injury is substantially certain to occur." Pariseau, 36 Ohio St.3d at 129.
 
 
 25
 Kunkler, in contrast, represents an instance in which an employer could properly be deemed to have crossed the boundary separating intentional conduct from negligence and recklessness. The two Goodyear employees in that case were injured in a fire and explosion caused by the mixing and heating of certain chemicals in a machine known as Banbury No. 4. The mixture, identified as Stock No. 33377, was to be used in the manufacture of tires and other rubber products. George Tucker, another Goodyear employee, submitted an affidavit stating that on three prior occasions--one as late as the day before the plaintiffs' accident--he had experienced explosions in Banbury No. 4 when mixing Stock No. 33377 but that, when he reported them, the supervisor had ordered him to "run the thing anyway." The plaintiffs' explosion occurred while they were mixing Stock No. 33377 in that same machine.
 
 
 26
 The Ohio Supreme Court held that summary judgment for Goodyear was inappropriate on such evidence. "Since the same stock number was used, the inference could be drawn that Goodyear directed the mixture of ingredients known to have caused three previous explosions and which would, with substantial certainty, result in employee injury." Kunkler, 36 Ohio St.3d at 139-40.
 
 
 27
 Thomas presented less evidence on the "substantial certainty" prong than did the Pariseau plaintiff--who was unsuccessful in his appeal--and much less than the Kunkler plaintiffs--who prevailed. The plaintiffs in those cases offered evidence tending to show that conditions were ripe for the very accidents which occurred. Thomas, in contrast, offers nothing from which a jury could infer that Peabody knew his accident was likely, let alone substantially certain, to occur. The bare insistence that the practice of operating the machine alone was dangerous, the element to be proven on the first prong of the test, and that it was also "common," does not suffice.
 
 
 28
 Even if Thomas had presented enough evidence regarding "substantial certainty," however, the directed verdict would still stand due to the lack of sufficient evidence on the third prong of the test. That prong directs an intentional tort claimant to demonstrate that his employer "required [him] to continue to perform the dangerous task," knowing that harm was substantially certain to occur.[5] Thomas claims to have met the "requirement" element with evidence that Peabody continually pushed the miners to boost production even when the crews were understaffed. This coercive atmosphere, Thomas claims, "inherently meant the absence of a second worker on the miner machine." We agree with the magistrate judge that a generalized encouragement of productivity cannot automatically be deemed a requirement that workers engage in specific, dangerous practices, especially when the defendant had assigned someone to serve as Thomas's helper despite the understaffing. Such evidence simply cannot compare to the instruction that Fyffe reach into the moving conveyor belt, nor to the insistence that Pariseau work on the defective punch press and remove finished parts with his hands (rather than the wooden stick), nor to the command that the Banbury No. 4 operators "run the thing anyway."
 
 
 29
 In an alternative attempt to meet the "requirement" element, Thomas points to the accident report prepared by defendant's supervisors in Fyffe. The report identified as a cause of Fyffe's accident "[h]azardous methods or procedures planned, condoned or directed by supervision...." Fyffe, 36 Ohio St.3d at 120. Thomas argues that the Ohio Supreme Court's finding for Fyffe on appeal necessarily means that an employer can be said to have "required" an employee to engage in a dangerous practice if it "condoned" that practice, as Peabody here allegedly condoned the single-handed operation of the continuous mining machine. This argument overlooks the fact that Fyffe's evidence revealed that he (unlike Thomas) was directly instructed to engage in the dangerous practice. It also contravenes the teaching of Van Fossen:
 
 
 30
 There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an "intentional tort" and therefore an exception ... to the exclusivity of the Act.
 
 
 31
 Van Fossen, 36 Ohio St.3d at 117.
 
 V.
 
 32
 Our disposition makes it unnecessary to address plaintiff's challenge to the exclusion of an employee grievance and a post-accident safety directive, which the magistrate judge respectively barred as prejudicial and as an attempt to offer subsequent remedial measures as proof of culpable conduct.
 
 
 33
 AFFIRMED.
 
 
 
 *
 Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 While this appeal was pending, Robert and Elizabeth Thomas, who had joined her husband's suit, filed for bankruptcy. Larry J. McClatchey, the Thomases' interim trustee in bankruptcy, was substituted as plaintiff-appellant. For ease in recounting trial testimony and arguments on appeal, however, we shall continue to refer to Thomas alone, rather than to McClatchey or "plaintiff(s)-appellant(s)."
 
 
 [2]
 The Fyffe court deleted the phrase, "and not just a high risk," which had followed the term "substantial certainty" in the second prong of the Van Fossen test (appearing in syllabus five of Van Fossen ). That phrase, according to Fyffe, had caused some judges to believe that the presence of "just a high risk" is somehow incompatible with a finding of an inference of intent to harm. Fyffe was meant to clarify that "some industrial activities that involve a high risk of harm, or where the risk of harm is great, may reasonably encompass situations that fall within the scope of an 'intentional tort.' " Fyffe, 59 Ohio St.3d at 117. Fyffe's deletion of a similar phrase in syllabus six of Van Fossen, reprinted below, was directed to the same end
 
 
 [3]
 Testimony also revealed that foremen, production managers, and superintendents were present at various times when the practice occurred
 
 
 [4]
 As explained above in footnote 2, the underscored text was deleted by Fyffe for suggesting that practices in which "the risk is great" may point only to recklessness, and never intent
 
 
 [5]
 Logic might require us to find for the defendant-employer on this third prong if we have already found in its favor on the second. If the employer has no knowledge that harm is substantially certain to occur, it cannot be found to have done anything at all "with such knowledge."